# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

Janya Sawyer, *et al.*,

v.                                Civil No. CCB-16-118

Union Carbide Corporation., *et al.*

## **MEMORANDUM**

Pending before the court is Janya Sawyer's motion for partial summary judgment as to defendant Foster Wheeler, LLC's ("Foster Wheeler") sophisticated user and superseding cause defenses. For the reasons outlined below, the court will grant Sawyer's motion. The issues have been briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2018).

## **BACKGROUND**

On December 1, 2014, Joseph Morris was diagnosed with asbestos-related mesothelioma. (Compl. at 12, ECF No. 2).[1] On March 1, 2015, Morris succumbed to the disease. (*Id.* at 13). The plaintiffs brought suit against Foster Wheeler, and a host of other defendants, alleging that Morris's mesothelioma was caused by his work at the Bethlehem Steel Sparrows Point Shipyard ("Bethlehem Steel") from 1948 through the 1970s. (*Id.* at 12). In its answer to the amended complaint, Foster Wheeler asserted several affirmative defenses. (Answer Am. Compl. at 4, 6, ECF No. 92). The plaintiffs have moved for partial summary judgment, seeking to bar two of these defenses: the sophisticated user defense; and the superseding cause defense.

---

[1] The plaintiffs' amended complaint (ECF No. 90) incorporates the statement of facts set forth in the Other Asbestos Cases Master Complaint. But because the original complaint most clearly sets forth the underlying facts of the case, and these facts are not in dispute, the court cites to the original complaint.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

### Sophisticated User Defense

The sophisticated user defense insulates suppliers of dangerous or defective products from liability for failing to provide a warning to users of the product if the supplier reasonably relied on an intermediary to provide a warning. *See Eagle-Picher Industries, Inc. v. Balbos*, 326 Md. 179, 217–18 (1992). In recognizing the defense in the product liability context, the Maryland Court of

2

Appeals adopted the majority view of the sophisticated user defense, as set forth in § 388 of the Second Restatement of Torts, and accompanying comment n. *See id.* at 218; *Kennedy v. Mobay Corp.*, 84 Md.App. 397, 403–13 (1990), *aff'd* 325 Md. 385 (1992) (per curiam).[2] As outlined in the Restatement, to determine whether the defense applies, the court "focuses on the conduct of the *supplier* of the dangerous product, not on the conduct of the intermediary." *Eagle-Picher*, 326 Md. at 218. Evidence that the intermediary understood the product's risks "does not, in and of itself, absolve the supplier of a duty to warn ultimate users." *Id.* Instead, the court must weigh several factors to determine whether the supplier acted reasonably in relying on the intermediary to warn users. *Id.* Specifically, the court must consider:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users.

*Id.* at 219 (citing *Mobay*, 84 Md.App. at 405).

This inquiry is inherently factbound, and in assessing whether the supplier acted

---

[2] The Restatement states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
> - (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> - (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> - (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

RESTATEMENT (SECOND) OF TORTS: CHATTEL KNOWN TO BE DANGEROUS FOR INTENDED USE § 388 (AM. LAW INST. 1965).

3

reasonably, the court must weigh the "magnitude of the risk involved" with the "burden which would be imposed" by requiring additional precautions. RESTATEMENT (SECOND) OF TORTS: CHATTEL KNOWN TO BE DANGEROUS FOR INTENDED USE § 388 cmt. n (AM. LAW INST. 1965). For example, "when the chattel is to be used in the presence or vicinity of the person supplying it" the burden imposed on the supplier by requiring the supplier to warn the user directly is slight. *Id.* The manner in which a product is distributed to an intermediary also affects the court's calculus. "For instance, when a supplier ships silica sand to a factory in railroad car quantities, it has been held reasonable for the supplier to rely on the knowledgeable management of the factory to disseminate warnings to the workers." *Eagle-Picher*, 326 Md. at 219. But if the supplier distributes its product in individual bags that are "personally handled by the workers, the balance of factors may favor requiring the supplier to place a warning on the bags." *Id.*

The reasonableness of the supplier's reliance on the intermediary to warn users of the product's dangers turns on not only the dangers posed by the product, or the manner in which the product is distributed, but also on what the supplier knows about the character and reliability of the intermediary. *Id.* "To be entitled to a sophisticated user instruction, suppliers, at a minimum, must have introduced evidence that they warned the intermediary of the danger, or that they knew a warning was unnecessary because the intermediary was already well aware of the danger." *Eagle-Picher*, 326 Md. at 220 (internal citations omitted). Absent such a showing, the sophisticated user defense is inapplicable. The sophisticated user defense as set forth in comment n of the Second Restatement "clearly focuses on what the product manufacturer knew and the reasonableness of its reliance on the employer *prior to and during the time the workers were exposed.*" *Id.* at 221 (quoting *Willis v. Raymark Industries, Inc.*, 905 F.2d 793, 797 (4th Cir. 1990)).

Foster Wheeler sets forth extensive evidence of Bethlehem Steel's knowledge of the

dangers of asbestos exposure. But Foster Wheeler has not established that prior to and during Morris's employment, Foster Wheeler was aware of Bethlehem Steel's knowledge of asbestos-related health risks, or that it was reasonable for Foster Wheeler to rely on Bethlehem Steel to warn its employees about these health risks. By way of example, Foster Wheeler argues that Bethlehem Steel had extensive knowledge of the dangers of asbestos exposure: in 1942 the U.S. Maritime Commission commissioned a health survey of Bethlehem Steel's Fairfield Shipyard, which recommended improved ventilation practices, (Def.'s Resp. Opp'n Pl.'s Mot. Partial Summ. J. ("Def.'s Resp.") Ex 3 at 4, 13–16, ECF No. 465-3);[3] in 1945 an industrial health survey was conducted at the Sparrows Point shipyard, which concluded that the use of asbestos was not a health hazard to Bethlehem Steel employees, (*id.* Ex 4 at 15, ECF No. 465-4); in 1945 the Bethlehem Steel Medical Director at Fore River Shipyard participated in another industrial health survey related to asbestos exposure and asbestos diseases, (*id.* Ex 5, ECF No. 465-5); in 1960, Bethlehem Steel set forth general safety rules for employees, which included requirements for respiratory protection, (*id.* Ex 9 at 5, ECF No. 465-9); in 1968 Dr. Paul J. Whitaker, Bethlehem Steel's Medical Director wrote in a memo that "there seems to be little doubt that a positive correlation exists between asbestosis and pleural or peritoneal mesothelioma," (*id.* Ex 14 at 3, ECF No. 465-14); in 1968 Allen D. Brandt, Bethlehem Steel's Manager of Industrial Health Engineering, wrote that "Bethlehem Steel Corporation has been aware of the asbestosis problem among employees exposed to asbestos dust, such as some of the shipyard workers, for many years," (*id.* Ex 16, ECF No. 465-16); and in 1971, a memo was circulated within Bethlehem Steel advising Bethlehem Steel executives of new Department of Labor standards for asbestos, (*id.* Ex 20). This evidence speaks to Bethlehem Steel's knowledge of the dangers of asbestos exposure,

---

[3] For consistency and readability purposes, citations utilize exhibit page numbers, rather than page numbers from the original documents.

but it does not demonstrate that Foster Wheeler was aware of Bethlehem Steel's knowledge of these risks.

In fact, the only evidence that Foster Wheeler presents to demonstrate that it knew Bethlehem Steel was aware of the risks of asbestos exposure is its assertion that two of the studies commissioned by the U.S. Maritime Commission were sent to Vice Admiral Earle W. Mills, who served as the wartime deputy chief of the Bureau of Ships for the Navy. (Def.'s Resp. at 8). Foster Wheeler notes that in 1949 Admiral Mills became an executive Vice-President at Foster Wheeler. (*Id.* Ex 6). Foster Wheeler argues that Admiral Mills, therefore, brought his knowledge about Bethlehem Steel's knowledge of the risks of asbestos exposure to Foster Wheeler. (Def.'s Resp. at 8). But by the court's reading, Foster Wheeler drastically overstates the implications of Admiral Mills' receipt of this information.

First, Foster Wheeler has not clearly indicated what information Admiral Mills allegedly received. In its response, Foster Wheeler cites to Exhibit 4 to support its assertion that Admiral Mills received two health studies during his tenure with the Navy. (*Id.*). But upon reviewing Exhibit 4, the court finds no evidence that it was sent to Admiral Mills; further, Exhibit 4 states that while asbestos is installed as pipe covering by several subcontractors, "[t]here is not considered to be an asbestosis hazard in this yard." (*Id.* Ex 4 at 2, 15). Foster Wheeler attaches two other exhibits to its response that are health surveys commissioned by the Maritime Commission: Exhibit 3 and Exhibit 5. Exhibit 3 draws no conclusions regarding asbestos. (*Id.* Ex 3). And the court sees no evidence that Exhibit 3 was sent to Admiral Mills. (*Id.*). Exhibit 5, however, does appear to have been sent to Admiral Mills. (*Id.* Ex 5 at 2). Accordingly, the court will focus its discussion on the implications of Exhibit 5.

The evidence contained in Exhibit 5 does not suffice to allow Foster Wheeler to present a

sophisticated user defense. First, the survey focuses on pipe covering—a different task than that performed by Morris. Second, the survey concludes that "[t]he incidence of asbestosis found was low—0.28% (3 cases out of 1074 x-rayed). Since each of these 3 men had worked at asbestos pipe covering in shipyards for more than 20 years, it may be concluded that such pipe covering is not a dangerous occupation." (*Id.* Ex 5 at 27, 30). This is far from a clear warning against asbestos exposure. Thus, even if the court were to assume that Admiral Mills read the survey and brought his knowledge of the survey to Foster Wheeler, the survey does not demonstrate that Bethlehem Steel, or any recipient of the survey, was adequately informed about the health risks associated with asbestos exposure. Accordingly, Foster Wheeler has not presented the court with evidence that prior to and during Morris's tenure at Bethlehem steel, Foster Wheeler was aware of Bethlehem Steel's knowledge of asbestos-related health risks.

What is more, Foster Wheeler's argument misunderstands the true nature of the reasonableness inquiry at the heart of the sophisticated user defense. To prevail under the defense Foster Wheeler must demonstrate that it *reasonably relied* on Bethlehem Steel to warn its employees about the dangers of asbestos exposure. *Eagle-Picher*, 326 Md. at 217–18. Sawyer has presented evidence, which Foster Wheeler has not disputed, that Foster Wheeler representatives were present at the Bethlehem Steel boiler shop where Morris worked two to three days per week "to oversee the construction of the boilers." (Pl.'s Mot. at 3; *Id.* Ex 3 ("Breeding Dep.") at 42–44, ECF No. 446-4; *Id.* Ex 4 ("Anders Dep.") at 35–36, ECF No. 446-5). Sawyer also has presented evidence that neither Morris nor his fellow employees received warnings about the risks of asbestos exposure or used respiratory protection. (Breeding Dep. at 42; Anders Dep. at 36–37). It was not reasonable for Foster Wheeler to rely on Bethlehem Steel to convey a warning about asbestos to its workers when Foster Wheeler repeatedly observed that Bethlehem Steel workers

were not using respiratory protection and, therefore, likely had not received any warning from their employer.

Indeed, given Foster Wheeler's continual presence at Bethlehem Steel, (Breeding Dep. at 42–44; Anders Dep. at 35–36), and the fact that its products were distributed to Bethlehem Steel workers in individual parts and containers, (Breeding Dep. at 32; Anders Dep. at 36), it would not have been unduly burdensome for Foster Wheeler to warn Bethlehem Steel employees either directly or by placing warnings on the parts and containers. Foster Wheeler did not act reasonably in relying on Bethlehem Steel to warn its employees about the dangers of asbestos exposure. Because Foster Wheeler has not proffered to the court any evidence that would allow it to present a plausible sophisticated user defense, the court will grant Sawyer's motion for summary judgment as to the sophisticated user defense.

<u>Superseding Cause Defense</u>

In assessing a superseding cause defense, unlike a sophisticated user defense, the "focus is on the intermediary's conduct rather than on the supplier's." *Eagle-Picher*, 326 Md. at 222. "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." RESTATEMENT (SECOND) OF TORTS: SUPERSEDING CAUSE DEFINED § 440 (AM. LAW INST. 1965); *see Copsey v. Park*, 453 Md. 141, 165 (2017) (quoting from § 440 of the Second Restatement of Torts to define superseding cause).

"A superseding cause arises primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Copsey*, 453 Md. at 145 (quoting *Pittway Corp v. Collins*, 409 Md. 218, 249 (2009)); *see Kiriakos v. Phillips*, 448 Md. 440, 473 (2016) (same); *Warr v. JMGM Group, LLC*, 433 Md. 170, 248 (2013)

8

(same). In Maryland, § 442 of the Second Restatement of Torts "establishes the test... for determining when an intervening negligent act rises to the level of a superseding cause." *Copsey*, 453 Md. at 166 (quoting *Pittway*, 409 Md. at 248). Section 442 states:

> The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:
>
> > (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
> >
> > (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
> >
> > (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
> >
> > (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
> >
> > (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
> >
> > (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

RESTATEMENT (SECOND) OF TORTS: SUPERSEDING CAUSE DEFINED § 442 (AM. LAW INST. 1965). "Proving that a third party's failure to warn was a cause superseding, as opposed to operating concurrently with, a defendant's failure to warn is a particularly difficult task in the asbestos products liability cases." *Eagle-Picher*, 326 Md. at 224 (collecting cases).

In support of its superseding cause defense, Foster Wheeler asserts that Bethlehem Steel knew about the risks associated with asbestos exposure as early as the 1940's, and, therefore, that Bethlehem Steel's failure to warn its employees rises to the level of a superseding cause. (Def.'s Resp. at 15–16). But the court finds nothing extraordinary or otherwise unforeseeable in Bethlehem Steel's failure to warn its employees about the hazards of asbestos exposure. First, the

evidence Foster Wheeler presents from the 1940's through the mid-1960's is, at best, mixed, if not outright dismissive of the dangers posed by asbestos exposure. (*See* Def.'s Resp. Ex. 4 at 15 ("There is not considered to be an asbestosis hazard in this yard."); *Id.* Ex 5 at 30 ("The incidence of asbestosis found was low . . . it may be concluded that such pipe covering is not a dangerous occupation); *Id.* Ex 10 at 2 ("To the best of our knowledge, welders and burners at the Hoboken yard are not exposed to significant concentrations of asbestos dust."); *Id.* Ex 11 at 2 ("We are disturbed by the references made by Dr. Selikoff to the conditions of pulmonary asbestosis. As far as we know, there is no basis for such a conclusion nor are we aware of the fact that there is an asbestos hazard at the Hoboken Yard."); *Id.* Ex 12 at 2 ("The question of possible health hazards associated with the inhalation of asbestos dust or asbestos fibers is at present under an intensive investigation . . . . Survey of the literature and informal discussions with U.S. Public Health Service personnel who are close to this project indicate that there is little or no reason to believe that use of asbestos textile protective clothing would be in any way hazardous to the health of the workers.")).

And even as public awareness about the danger of asbestos-exposure increased in the late 1960s and the 1970s, Foster Wheeler has presented no evidence that Bethlehem Steel's practices were so extraordinary, or so out of line with the practices of its industry peers, as to rise to the level of a superseding cause. *Cf. Eagle-Picher*, 326 Md. at 226. In fact, during Morris's tenure at Bethlehem Steel, Foster Wheeler representatives came to Morris's worksite multiple times per week to oversee the workers assembling boilers. (Breeding Dep. at 42–44; Anders Dep. at 35–36). While at Bethlehem Steel these Foster Wheeler representatives could readily observe that Morris and his fellow workers were not using respiratory protective gear, and yet Foster Wheeler took no action. Foster Wheeler's inaction is, in and of itself, evidence of the foreseeability of Bethlehem

Steel's alleged negligence, and evidence that Bethlehem Steel's practices were not so extraordinary as to cause alarm. Foster Wheeler has not set forth sufficient evidence to create a jury issue on superseding cause. Accordingly, the court will grant Sawyer's motion for summary judgment as to Foster Wheeler's superseding cause defense.

## CONCLUSION

For the reasons stated above, Sawyer's motion for partial summary judgment will be granted. A separate order follows.

4/29/19
Date

/s/ CCB
Catherine C. Blake
United States District Judge